1
2
3
4
5
6
7
8               **UNITED STATES DISTRICT COURT**
9             **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11 BETTY SUE HARLAN and GLEN C. HEMPHILL, | CASE NO. 07-CV-0686 IEG (BLM) |
| 12                 Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| 13    vs. | |
| 14 | |
| 15 ROADTREK MOTORHOMES, INC., formerly known as HOME & PARK MOTORHOMES; HANMAR MOTOR | **[Doc. Nos. 26 and 44]** |
| 16 CORPORATION; MCMAHON'S RV SUPERSTORE, INC.; FIRST EXTENDED | |
| 17 SERVICE CORPORATION; and DOES 1 through 75, | |
| 18               Defendants. | |

19       Presently before the Court are defendant Roadtrek Motorhomes, Inc.'s ("Roadtrek") and

20 defendant McMahon's RV Superstore, Inc.'s ("McMahon's") motions for summary judgment on all

21 of the claims plaintiffs have brought against them.  Plaintiffs Betty Sue Harlan ("Harlan") and Glenn

22 C. Hemphill ("Hemphill") bring this action against McMahon's, Hanmar Motor Corporation

23 ("Hanmar"), Roadtrek, and First Extended Service Corporation ("First Extended").  In their first

24 amended complaint, plaintiffs allege: (1) violations of the federal Magnuson-Moss Warranty Federal

25 Trade Commission Improvement Act, 15 U.S.C. §§ 2301 *et seq.* ("Magnuson Moss Act"); (2)

26 violations of California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("Consumer

27 Legal Remedies Act"); (3) violations of ten different provisions of California's Song-Beverly

28 Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq.* ("Song-Beverly Act"); (4) Breach of Express

Warranty under the California Commercial Code; (5) Breach of Implied Warranties of Merchantability and Fitness under the California Commercial Code; (6) Breach of Contract; (7) Breach of Implied Covenant of Good Faith and Fair Dealing; (8) Strict Products Liability; (9) Negligence; and (10) Fraud.  Plaintiffs seek general and special damages, as well as damages for: loss of use of the vehicle; emotional distress; property damage; and numerous types of statutorily-prescribed damages, penalties, and attorney's fees.  Specifically, plaintiffs allege causes of action (1)-(5) and (8)-(10) against Hanmar/Roadtrek,[1] and causes of action (2)-(10) against McMahon's.

Plaintiffs have filed oppositions to both motions.  Defendants have filed replies to the oppositions.  Plaintiffs have also filed evidentiary objections.  The Court heard oral argument on March 3, 2009.  After considering the parties' arguments, and for the reasons explained herein, the Court: (1) grants Roadtrek's motion in part; (2) denies Roadtrek's motion in part; (3) grants McMahon's motion in part; (4) denies McMahon's motion in part; and (5) overrules all of plaintiffs' evidentiary objections.

## BACKGROUND

Plaintiffs owned a large "Class A" motorhome for many years, but eventually decided to purchase a smaller motorhome that required less maintenance and was easier to drive.  On April 17, 2004, after researching Roadtrek vehicles, plaintiffs visited McMahon's Irvine branch to view Roadtrek models.  On that day, plaintiffs paid McMahon's a $10,000 deposit for a Roadtrek 200 Popular, a "Class B" van-size motorhome.  On May 14, 2004 plaintiffs signed a retail installment sale contract to buy the motorhome ("the vehicle").  Plaintiffs also purchased a Recreational Vehicle Parts and Labor Agreement ("service contract") administered by First Extended for $2,995.00.  Plaintiffs paid a total of $76,734.22 for the vehicle, including taxes, fees, and the service contract.

McMahon's provided plaintiffs with the Roadtrek owners' manual, which included warranty information.  The warranty coverage consisted of three parts: an automotive warranty, an appliance warranty, and the Roadtrek Limited Warranty.  Chevrolet provided the automotive warranty for the

---

[1] Hanmar Motor Corporation was renamed Roadtrek Motorhomes, Inc. in January 2007. [Hammill Decl. ISO Dfdts' Motions ("Hammill Decl."), Doc. Nos. 28 and 46, Ex. A.]  Roadtrek has assumed all of Hanmar's debts liabilities and obligations, including warranty obligations. (Hammill Decl., ¶ 2.)

chassis.  The Roadtrek Limited Warranty (further detailed *infra*) covered the coach.  The appliance warranty stated that the following individual appliances were not warranted by Roadtrek, but were covered by the appliances' respective manufacturers:  air conditioner, electrical converter/charger, furnace, generator, microwave oven, range hood exhaust fan, refrigerator, stove, toilet, water pump, and water heater.

Plaintiffs contend the vehicle began to experience several problems shortly after purchase.  When plaintiffs brought the vehicle home from the dealer Hemphill noticed the side door was not flush with the vehicle's body, "was not closing or opening properly and was difficult to operate."  [Hemphill Decl. ISO Plts' Motions ("Hemphill Decl."), Doc. Nos. 67-3 and 68-3, ¶ 4; May 23, 2008 Deposition of Glen C. Hemphill ("Hemphill Depo.") Ex. 9 to Plts' Notice of Lodgment ("NOL"), p.138.]  Furthermore, shortly after their purchase plaintiffs had hoped to take the vehicle to Pismo Beach, California, but had to cancel the trip because the refrigerator would not operate on propane.  Hemphill called McMahon's on May 20, 2004 to report the problem and brought the vehicle in for service that same day.  Hemphill claims McMahon's told him the door could not be fixed and that the propane problem came from a "slow leak" in the system.

Plaintiffs first attempted to take a trip in the vehicle on September 1, 2004.  On the way to Oxnard, California, plaintiffs noticed the electrical system cutting off power to the microwave and roof air conditioner.  Plaintiffs stopped at McMahon's, where technicians restored electricity to the air conditioner, but were not able to restore electricity to the microwave.  Plaintiffs agreed to return to McMahon's after their trip.  During the trip to Oxnard, rainwater leaked into the coach unit "through a vent in a steady stream."  (Hemphill Decl., ¶ 6.)  Plaintiffs also experienced problems with leaking propane (preventing them from using the refrigerator), an overflowing toilet, falling molding trim, and missing upholstery buttons.  (Hemphill Decl., ¶ 6.)

Plaintiffs called  Roadtrek directly about warranty repairs on September 4, 2004.  They complained about the problems experienced on their trip to Oxnard, and additionally reported the propane gas would not turn on, the curtain track had come undone [Roadtrek Call Log, Deakins Decl. ISO Dfdts' Motions ("Deakins Decl."), Doc. Nos. 31 and 50, Ex. B,) and that the curtains were stained from the roof leak.  (Hemphill Decl., ¶ 7.)  Plaintiffs visited McMahon's Irvine, California location

1   for warranty repairs on September 28, 2004.  The associated work order states McMahon's repaired

2   the circuit breaker, the leaking roof air conditioner ("roof leak"), the running toilet, loose rubber trim

3   around the door, missing buttons above the entry door, the front privacy curtain, and the barbeque

4   propane (LPG) regulator.  [Schilperoort Decl. ISO Dfdts' Motions ("Schilperoort Decl."), Doc. Nos.

5   29 and 48, Ex. D.]  Plaintiffs, however, contend they were told that there was "no fix" to the roof leak,

6   and that water intrusion would result every time "the motorhome was pointed in a certain direction

7   in the rain."  (Hemphill Decl., ¶7.)

8          Plaintiffs next attempted to use the vehicle on a trip to Las Vegas, Nevada on June 26, 2005.

9   They determined that McMahon's did not fix the propane leak because the tank was completely empty

10  when they left home.  (Hemphill Decl., ¶ 9)  Plaintiffs stopped, had the tank filled, and after turning

11  on the propane valve discovered a "blasting leak" from under the vehicle. (Deakins Decl.,  Ex. C.)

12  Plaintiffs canceled their Las Vegas  hotel reservations for the following day and brought the vehicle

13  into McMahon's for service on June 27, 2005.  (Id.)[2]  McMahon's found a leaking propane accessory

14  valve assembly, but did not have a spare part in stock, and told plaintiffs they could not be scheduled

15  for installation of the new part until August 2005.  (Id.)

16         Notwithstanding the missing part, Plaintiffs left for Las Vegas on June 29, 2005 but allege they

17  had problems with the generator and propane system, which impeded use of the refrigerator and air

18  conditioning.  Plaintiffs cancelled the next two days of the trip because of these problems, which made

19  them exceedingly uncomfortable in the summer heat.  (Hemphill Depo. at 185, 188; Deakins Decl.,

20  Ex. C.)   Plaintiffs also claim they cancelled an upcoming trip to Seattle, Washington because

21  McMahon's did not have the part. (Deakins Decl., Ex. C; Hemphill Decl., ¶ 11.)

22         Plaintiffs called Roadtrek on July 18, 2005, and spoke to Christopher Deakins ("Deakins,")

23  the service and warranty coordinator, to report they were having "lots of issues with the van."

24  (Roadtrek Call Log, Deakins Decl., Ex. B.)  Plaintiffs reported the vehicle's  refrigerator had stopped

25  working on propane, and the air conditioner had stopped working on the generator.  Plaintiffs also

26  _____

27         [2]  Roadtrek has no record of the June 27, 2005 visit. (Motion at 7.)  In fact, the parties widely
    dispute the number of times the vehicle was serviced.  Roadtrek maintains they only have records of
28  three visits for repairs during the warranty period chronicled by four different work orders. (Deakins
    Decl., ¶ 11.)  Plaintiffs claim to have made at least ten visits to McMahon's for repairs. (Opp. at 9.)

1    reported that they had a propane leak, a water leak from the air conditioner area, and a water leak from

2    the rear window.

3        Mr. Hemphill contends he brought the vehicle to McMahon's on August 16, 2005 and they

4    provided him with a list of necessary repairs for the vehicle.  (Hemphill Decl., ¶ 13.)  This list called

5    for repair work on the propane system, the rear window latches, the side door molding, a loose table,

6    loose entertainment center doors, a rattling wardrobe door, and a malfunctioning closet drawer, a

7    screw in the floor trim, and a missing water drain bracket. [Obeid Decl. ISO Dfdts' Motions ("Obeid

8    Decl."), Doc. Nos. 27 and 45, Ex. B.][3]  Plaintiffs state they forwarded a "memo" listing these repairs

9    to "Roadtrek and/or McMahons"(Hemphill Decl., ¶ 13,) and they noted additional problems with the

10   generator "running rough during a trip to Las Vegas," the refrigerator not working on propane, a still-

11   missing propane regulator, a leaking rear window, a kitchen rug stained from refrigerator food

12   leakage, a missing cover on the electrical box near the engine, and a missing fresh water drain bracket.

13   (NOL, Ex. 13, PTLF 59.)

14       In early January 2006, plaintiffs drove the vehicle to San Rafael California. (Hemphill Depo

15   at 271.)  Although the propane system and generator functioned on that trip, strips of metal molding

16   and trim became detached from the interior of the vehicle.  (Hemphill Depo at 273-274.)  Mr.

17   Hemphill states that on February 1, 2006 he forwarded another list of necessary repairs to "Roadtrek

18   and/or McMahon's." (Hemphill Decl., ¶ 14.)  In addition to previously-documented problems, the list

19   describes loose screws in the overhead panels, a loosened shelf on the DVD unit, a bathroom door that

20   opened during transit, and a problem with the curtain bracket.  (NOL Ex. 13, PTLF 65).  Plaintiff sent

21   this list to Roadtrek.

22       A March 14, 2006 email from James Hammill ("Hammill,") Roadtrek's president, to Mr.

23   Deakins indicates an agreement that Mr. Hemphill would take the vehicle to McMahon's on April 18,

24   where they would discuss his final list of repairs and "they will repair everything once and for all."

25   (NOL, Ex. 1, RMI 100.)  A March 20, 2006 email from Mr. Deakins to Paul Schilperoort, Roadtrek's

26   director of service and parts, states "we need to get this customer taken care of as his issues go back

27

28       [3]  Defendants state they cannot verify the authenticity of this work order and that there is no record of it in either McMahon's or Roadtrek's files.  (Motion at 7.)

1    quite sometime." (NOL, Ex. 1, RMI 101.)

2          Plaintiffs visited McMahon's Stanton, California location for warranty repairs on April 18,

3    2006.  The associated work order states McMahon's repaired: loose screws in the vehicle's overhead

4    panels, a rattling DVD shelf unit, loosened mounts on the front and rear tables, loosened trim around

5    the rear door, the rattling closet drawer, a curtain bracket slide, the propane regulator valve, a missing

6    electrical box cover, a detached rear view mirror, and the rattling rear side door.  The technician noted

7    the missing fresh water drain bracket and ordered a new part.  Additionally, the technician checked

8    the vehicle in response to plaintiffs' complaints that the shower door opened while in transit, electrical

9    problems prevented the refrigerator from functioning, and water leaked through the rear window.  The

10   technician found none of these additional problems existed.  [Schilperoort Decl., Ex. E.]  On May 9

11   and May 23, 2006 (Hemphill Decl., ¶ 16) plaintiffs visited McMahon's to obtain additional repairs

12   to the side door and table leg.

13         On November 21, 2006, Mr. Hemphill called Roadtrek to report difficulty in opening the side

14   door from the outside. (Deakins Decl., Ex. B.)  Mr. Hemphill and Mr. Deakins agreed that Mr.

15   Hemphill would take the vehicle to McMahon's for repairs on the door.  On November 30, 2006

16   plaintiffs returned to McMahon's.  The associated work order states "[r]emoved the door panel and

17   stricker [sic] is not adjustable.  Inspected door.  Door looks to be out of alignment[,] larger gap at the

18   top of door and as door goes down the space gets more narrow. Recommend body shop to advise."

19   (Schilperoort Decl., Ex. G).

20         Mr. Deakins called Mr. Hemphill on January 9, 2007 to ensure the door was repaired properly,

21   and Mr. Hemphill reported the door was "still a problem as well as several other new things."

22   (Roadtrek Phone Log, Deakins Decl., Ex B.)  Mr. Deakins arranged to meet with Mr. Hemphill during

23   the week of January 15, 2007.  (Deakins Decl., ¶ 8-9.)  Mr. Deakins met with Mr. Hemphill on

24   January 17, 2007 at the outdoor storage facility where plaintiffs kept the vehicle.[4]  Mr. Deakins

25   inspected the side door and described it as: "fully operational.  The two stage latch engaged and

26   disengaged freely.  The door did not drag or bind, and was properly secured on its hinges."  (Deakins

27

28         [4] Deakins notes he considered the vist a "coutesy call" and not a repair attempt.  (Deakins
           Decl., ¶ 9.)

Decl., ¶ 9.)  Mr. Deakins also notes that "Mr. Hemphill, who is elderly, had a tendency to slowly pull on the handle in a limp motion."  Mr. Deakins states he attempted to adjust the door catch in an attempt to make it easier to open, but that Mr. Hemphill still struggled with the door.  (Id.)

In mid-November 2007, plaintiffs entered the vehicle for the first time since August 2007 and found the television had detached from the wall mount screws and trim had pulled out of place. (Obeid Decl., Ex. C.)  In addition, the side door still "move[d] along its hinge in a heavy and cumbersome manner" and was not flush with the side of the motorhome.  (Hemphill Decl., ¶ 17.)

On February 5, 2008, defendants' expert Ben Spengen conducted a preliminary inspection of the alleged defects.  Mr. Spengen found the vehicle to be in operational condition, and the side door to be fully functional.  Mr. Spengen also found no leaks in the propane system, but did not fill the propane tank to capacity to verify this finding. [Spengen Decl. ISO Dfdts' Motion, ("Spengen Decl."), Doc. Nos. 32 and 51, Ex. 2., p. 5.]  On May 28, 2008, Mr. Spengen conducted a full inspection of the vehicle with Mr, Deakins present.  Mr. Spengen concluded the vehicle was "fully operational" and that its use as a recreational vehicle was not impaired.  The side door and latch operated properly, and he videotaped Mr. Deakins opening the side door using only the small finger of his right hand.  Mr. Spengen's report does not indicate that he filled the propane system to capacity to test for a leak.  He noted the LPG regulator leaked, but stated such leaks were very common for that type of valve.  Mr. Spengen ultimately concluded the vehicle was worth approximately $34,000, consistent with the national average for similar used vehicles. (Spengen Decl., Ex. 3.)  Mr. Hemphill maintains the propane system continues to leak, because when he checked the propane tank in January 2009 it was completely empty.  (Hemphill Decl., ¶ 22.)

## DISCUSSION

### I.    Legal Standard

Summary judgment is proper where the pleadings and materials demonstrate "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A material issue of fact is a question the trier of fact must answer to determine the rights of the parties under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute

1    is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

2    party." Id. at 248.  Summary judgment may be granted in favor of a moving party on an ultimate issue

3    of fact where the moving party carries its burden of "pointing out to the district court that there is an

4    absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325; see Nissan

5    Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1106 (9th Cir. 2000).

6         The moving party bears "the initial responsibility of informing the district court of the basis

7    for its motion." Celotex, 477 U.S. at 323.  To satisfy this burden, the moving party must demonstrate

8    that no genuine issue of material fact exists for trial. Id. at 322.  However, the moving party is not

9    required to negate those portions of the non-moving party's claim on which the non-moving party

10   bears the burden of proof. Id. at 323.  To withstand a motion for summary judgment, the non-movant

11   must then show that there are genuine factual issues which can only be resolved by the trier of fact.

12   Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000) (citing Fed. R. Civ. P. 56;

13   Celotex, 477 U.S. at 323).  The nonmoving party may not rely on the pleadings but must present

14   specific facts creating a genuine issue of material fact.  Nissan Fire, 210 F.3d at 1103.  The inferences

15   to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion,

16   but conclusory allegations as to ultimate facts are not adequate to defeat summary judgment.  Gibson

17   v. County of Washoe, Nev., 290 F.3d 1175, 1180 (9th Cir. 2002).  The Court is not required "to scour

18   the record in search of a genuine issue of triable fact," Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.

19   1996), but rather "may limit its review to the documents submitted for purposes of summary judgment

20   and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch.

21   Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).

22   **II.    Plaintiffs' Evidentiary Objections**

23        Plaintiffs argue the Court should exclude the opinions of defendants' expert Ben Spengen as

24   untimely or alternatively, because they are inappropriate expert testimony.[5]

25   ///

26

27        [5]  Plaintiffs have also filed numerous other evidentiary objections.  The Court finds the
     evidentiary objections, beyond those addressed herein, do not impact its determination of the merits
28   of defendants' motions for summary judgment.  The Court accordingly overrules the objections as
     moot.

A)      Timeliness of Mr. Spengen's Final Report

Fed. R. Civ. P. 26(a) (2009) lists the requirements for disclosure of expert testimony during the discovery process.  Fed. R. Civ. P. 26(a)(2)(D) imposes a duty on parties to supplement their expert disclosures if required by Fed. R. Civ. P. 26(e)).  Rule 26(e) mandates that all disclosures shall be supplemented in a timely manner if incomplete or incorrect in a material respect.   This supplemental information is due by the time of the party's pretrial disclosures under Rule 26(a)(3)(B) (30 days before trial unless the court orders otherwise).  Fed. R. Civ. P. 26(e)(2) (2009).

In this case, defendants arranged for Mr. Spengen to conduct a visual inspection of the vehicle on February 5, 2008. (Spengen Decl., ¶ 4.) Defendants produced Mr. Spengen's "Preliminary Expert Report," based on that inspection, on or about March 21, 2008. [Howerton Decl. ISO Plts' Opps. ("Howerton Decl."), Doc. Nos. 67-4 and 68-4, ¶ 4.]  In his preliminary expert report, Mr. Spengen commented, *inter alia*, on the vehicle's appliances, propane system, windows and doors, interior elements, an general functionality.  With respect to the vehicle's side door, he noted the door was "fully functional," fit snugly against the jamb seal, did not rattle, and opened without a problem when the handle was fully extended.  (Spengen Decl., Ex. 2, pp. 5-6.)  Mr. Spengen also found that he needed to conduct further inspection of the generator and refrigerator. (Id., p. 4.)

Plaintiffs argue they stipulated to Mr. Spengen conducting additional testing of the generator and refrigerator.  He performed this testing on May 28, 2008, eight days prior to the discovery cutoff. Defendants presented plaintiffs with Mr. Spengen's "final report," based on both his inspections, at his deposition on May 30, 2008.  Plaintiffs argue, however, that the second inspection went beyond the scope upon which the parties agreed because "defendants' experts and staff conducted inspections of areas and items on the vehicle that were previously inspected, took photographs of the vehicle, and video of the side door."  (Plts. Evid. Obj. at 6.)  Specifically, plaintiffs claim the parties did not agree the second inspection could provide a second chance for Mr. Spengen to inspect the side door. Plaintiffs argue that all portions of Mr. Spengen's final expert report referencing the side door of the vehicle, and the video of Mr. Deakins opening the door should be excluded under Fed. R. Civ. P.

37(c)[6] because this information was not "supplemental" as defined by the federal rules.  Defendants argue they properly produced the report as a supplemental expert report under to Fed. R. Civ. P. 26.

Because Mr. Spengen's preliminary report contained his opinion regarding the functionality of the side door, and the final report and video contained information consistent with those opinions, the Court finds the portions of his final report to which plaintiffs object were properly "supplemental" under Fed. R. Civ. P. 26(a)(2)(D), and do not disadvantage plaintiffs' case.  Moreover, the supplemental disclosures were timely because they were not due until October 14, 2008.  (Original Scheduling Order, Doc. No. 16.)

B)  Propriety of Expert Testimony

Plaintiffs alternatively argue Mr. Spengen's testimony is not proper expert testimony because the subjects to which he testifies are not based in scientific, technical, or other specialized knowledge. (Opp. at 13; Plts' Evid. Obj. at 4.)  Plaintiffs focus on Mr. Spengen's opinions regarding the opening and closing of the side door, arguing a determination of whether a motorhome door easily opens and closes is well within the province of common knowledge.  Plaintiffs also argue the quality and workmanship of the motorhome interior, are "not outside anyone's ordinary experience operating a vehicle."  (Plts' Evid. Obj. at 4.)

Federal Rule of Evidence 702 allows the admission of expert testimony where it will assist the jury in understanding the evidence or determining a fact in issue.  Jurors will only be assisted by: (1) a qualified expert (2) testifying about a proper subject (3) in conformity with a generally accepted explanatory theory (4) with more probative value than prejudicial effect.  United States v. Castaneda, 94 F.3d 592, 595 (9th Cir. 1996).  The admissibility of expert testimony is within the sound discretion of the trial judge, "'who alone must decide the qualifications of the expert on a given subject and the extent to which his opinions may be required.'"  United States v. Chang, 207 F.3d 1169, 1172 (9th Cir. 2000) (quoting Fineberg v. United States, 393 F.2d 417, 421 (9th Cir. 1968)).

Plaintiffs are correct that it may not take specialized knowledge to determine whether a vehicle's side door opens and closes without difficulty.  However, the door's functioning is connected

---

[6] "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (2009).

08cv0686

1  to larger issues regarding standards of workmanship for motorhomes, which are not matters within

2  a layperson's knowledge.  Someone such as Mr. Spengen, with many years' experience in the

3  production of motorhomes[7] could assist the trier of fact in determining these standards.  Plaintiff's

4  evidentiary objections to Mr. Spengen's expert testimony are overruled.

5  **III.    Song-Beverly Act Claims (Plaintiffs' Third Cause of Action)**

6         Plaintiffs' third cause of action alleges Roadtrek and McMahon's violated seven different

7  provisions of the Song-Beverly Act, specifically: Cal. Civ. Code §§ 1792, 1792.1, 1793.1, 1793.2,

8  1793.22, 1793.23, 1793.24, 1794.4, 1794.41, and 1795.5. The Song-Beverly Act defines a broad class

9  of consumer sales and specifies the requirements for the creation and exclusion of warranties

10  accompanying such sales.   4 Witkin, Summary 10th (2005) Sales, § 314.

11         As an initial matter, plaintiffs have not opposed several of defendants' arguments under the

12  Song-Beverly Act.  Therefore, the Court grants summary adjudication in favor of Roadtrek and

13  McMahon's on the following claims: Cal. Civ. Code §§ 1793.1; 1793.22; 1793.23; 1793.24; and

14  1795.5.  The Court addresses the remaining claims below.

15         A)      § 1792  Implied Warranty of Merchantability

16              1)      Legal Standard

17         Cal. Civ. Code § 1792 (2009) provides, "every sale of consumer goods that are sold at retail

18  in this state shall be accompanied by the manufacturer's and the retail seller's implied warranty that

19  the goods are merchantable."  Unlike an express warranty, "'the implied warranty of merchantability

20  arises by operation of law' and 'provides for a minimum level of quality.'"  Isip v. Mercedes-Benz

21  USA, LLC, 155 Cal. App. 4th 19, 26 (Cal. Ct. App. 2007) (citations omitted).  Implied warranties of

22  Merchantability under the Song-Beverly Act are defined at Cal. Civ. Code § 1791.1(a) (2009).  Goods

23  in conformity with the Act meet each of the following conditions: "(1) Pass without objection in the

24  trade under the contract description[;] (2) Are fit for the ordinary purposes for which such goods are

25  used[;] (3) Are adequately contained, packaged, and labeled[;] and (4) Conform to the promises or

26

27         [7]   Mr. Spengen has worked for Roadtrek since 1981.  He spent twenty five years as a
28  Production Manager, overseeing the internal manufacturing process of Roadtrek vehicles. From April
    2006 to the present he has worked as Roadtrek's Service, Warranty, & Parts Manager.  (Spengen
    Decl., Ex. 1.)

affirmations of fact made on the container or label."  The duration of the implied warranty of Merchantability is coextensive with an express warranty, but in no case is shorter than 60 days or longer than 1 year following sale of the goods.  Cal. Civ. Code § 1791.1(c) (2009); <u>Atkinson v. Elk Corporation of Texas</u>, 142 Cal. App. 4th 212, 231 (Cal. Ct. App. 2006).

    2)  <u>Analysis</u>

  The core test for merchantability is fitness for the ordinary purpose for which a good is used. <u>Isip</u>, 155 Cal. App. 4th at 26.  The implied warranty of merchantability "does not 'impose a general requirement that goods precisely fulfill the expectation of the buyer.  Instead, it provides for a minimum level of quality.'"  <u>Am. Suzuki Motor Corp. v. Superior Court</u>, 37 Cal. App. 4th at 1296 (Cal. Ct. App. 1995).  The relevant question for the Court, therefore, is whether, during the first year following the sale of the vehicle, it was fit for the ordinary purposes for which motorhomes are used. In this case, there exist numerous issues of material fact as to the vehicle's fitness for ordinary use during that time period.

  Plaintiffs have at the very least presented evidence that during the first year they owned the vehicle: the side door of the van was not aligned with the body, there was a "slow leak" in the propane system, and when it rained, water leaked into the coach in a "steady stream."  In response to the last problem, plaintiffs were informed such a water intrusion would result through the roof air conditioner "every time the motorhome was pointed [with the front end inclined lower than the rear end] in the rain." (Hemphill Decl., ¶7; Deakins Decl., Ex. C at RMI 87).  Although defendants' expert has opined that the vehicle is "functional" as a motor home, disputes of material fact exist as to whether the vehicle is fit for the ordinary purposes for which motorhomes are used during the first year after its purchase.  Defendants' reliance on <u>Harnden v. Ford Motor Co.</u>, 408 F. Supp. 2d 315, 321 (E.D. Mich. 2005) is misplaced. Defendants cite <u>Harnden</u> in arguing that a because motorhomes are complex, "the mere fact that repairs are required does not mean that a warranty has been breached."  That particular discussion in <u>Harnden</u> applied to an analysis of breach of an express warranty, however, and not breach of an implied warranty under a standard similar to that of the Song Beverly Act.  The Court denies Roadtrek and McMahon's motions for summary judgment on the § 1792 claim.

///

1    B)    § 1792.1 Implied Warranty of Fitness for Particular Purpose

2         1)    Legal Standard

3         An implied warranty of fitness for a particular purpose applies to retailers, distributors, and

4    manufacturers of goods sold in California.  Cal. Civ. Code, §§ 1791.1, 1792.1, 1792.2(a) (2009).  An

5    implied warranty of fitness for a particular purpose arises only where (1) the purchaser at the time of

6    contracting intends to use the goods for a particular purpose, (2) the manufacturer or seller at the time

7    of contracting has reason to know of this particular purpose, (3) the buyer relies on the manufacturer

8    or seller's skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the

9    manufacturer or seller at the time of contracting has reason to know that the buyer is relying on such

10   skill and judgment.  Keith v. Buchanan, 173 Cal. App. 3d 13, 25 (Cal. Ct. App. 1985).  The duration

11   of the implied warranty of fitness is coextensive with an express warranty, but in no case is shorter

12   than 60 days or longer than 1 year following sale of the goods.  Cal. Civ. Code § 1791.1(c) (2009).

13        2)    Analysis

14        Plaintiffs' claim is deficient for many reasons.  It fails primarily  because they have proffered

15   no evidence showing that they intended to use the vehicle for a "particular purpose."  A "particular

16   purpose" under § 1792.1 "differs from the ordinary purpose for which the goods are used in that it

17   envisages a specific use by the buyer which is peculiar to the nature of his business whereas the

18   ordinary purposes for which goods are used are those envisaged in the concept of merchantability and

19   go to uses which are customarily made of the goods in question."  Am. Suzuki, 37 Cal. App. 4th at

20   1295 n.2.  Plaintiffs correctly assert that Roadtrek's advertising suggests  the vehicle is suitable for

21   use by elderly persons for cooking, sleeping, and transportation.  (Roadtrek Brochure, NOL, Ex. 4.)

22   However, the fact that these were the vehicle's advertised uses indicates the scope of its "ordinary

23   use,"as opposed to any use peculiar to plaintiffs.  Plaintiffs have not shown they intended to use the

24   vehicle for any purpose beyond the ordinary uses Roadtrek advertised.  Thus this claim fails as a

25   matter of law.

26   ///

27   ///

28   ///

C)     § 1793.2 Duties of Manufacturer Making an Express Warranty

1)     Legal Standard

Section 1793.2 incorporates several aspects of the Song-Beverly Act's comprehensive regulation of express warranties for consumer goods.  Nat'l R.V. v. Foreman, 34 Cal. App. 4th 1072, 1077-1078 (Cal. Ct. App. 1995).  Section 1793.2 requires manufacturers of consumer goods sold in California to arrange for sufficient service and repair facilities to carry out the terms of warranties (§ 1793.2(a)); sets a time limit for the repair of consumer goods (§ 1793.2(b)); sets rules for delivering nonconforming goods for service and repair (§ 1793.2(c)); and requires a manufacturer to replace the good or reimburse the buyer if the manufacturer or its representative is unable to repair the consumer good after "a reasonable number of attempts." (§ 1793.2(d)).  A plaintiff pursuing an action under § 1793.2 has the burden to prove the following elements: (1) the product had a defect or nonconformity covered by the express warranty; (2) the product was presented to an authorized representative of the manufacturer for repair; and (3) the manufacturer or its representative did not repair the defect or nonconformity after a reasonable number of repair attempts.  Robertson v. Fleetwood Travel Trailers of California, Inc., 144 Cal. App. 4th 785, 798-799 (Cal. Ct. App. 2006).

2)     Terms of the Roadtrek Limited Warranty

The Roadtrek Limited Warranty states that Roadtrek

> "warrants to the Purchaser that the vehicle is free from defects in material and workmanship on the portion manufactured by [Roadtrek], under normal use and service, for three (3) years, or 36,000 miles . . . whichever occurs first, from the date of purchase by the first Purchaser. . . .  This warranty shall be fulfilled at a Home & Park Dealer or authorized Roadtrek repair facility. . . .All RV service facilities and warranty repairs must be preauthorized by Home & Park.  Home & Park will, at its option, replace or repair free of charge (including related labor) any defective part, about which the Purchaser shall notify their Roadtrek dealer within the warranty period.  The obligation of Home & Park under this warranty, is expressly limited to such replacement or repair."

(Roadtrek Owner's Manual at I-3, Deakins Decl., Ex. A)  The policy, in relevant part, also contains a limitation clause stating that the limited warranty's provisions does not apply to "wear and exposure" beyond the following limitations:

> For one (1) year or 12,000 miles . . .  which ever comes first, from date of purchase by the first Purchaser for curtain fabric and tracks, seating fabric, carpet, wall liner fabric, door panel fabric, cup holders, exterior stripes and decals, exterior painted

1  surfaces, exterior fiberglass surfaces, running board trim, black and grey water tank
2  valves and LPG regulator.[8]

3  (Id.) The Roadtrek Limited Warranty states that its provisions are void if purchasers do not "present

4  their vehicle to a Roadtrek Dealer as soon as a problem exists.  The warranty repairs should be

5  completed in a reasonable amount of time for the date of authorization."  (Id. at I-4.)  In addition to

6  providing coverage information, the Roadtrek Limited Warranty instructs the purchaser about how

7  to obtain warranty service.  (Id. at K-1.)

8           3)       Analysis

9           Cal. Civ. Code § 1793.2(d)(1) provides that if a "manufacturer or its representative in this state

10  does not service or repair the goods to conform to the applicable express warranties after a reasonable

11  number of attempts, the manufacturer shall either replace the goods or reimburse the buyer."  Section

12  1793.2(d)(2), adopted in 1987, expanded the protections of § 1793.2 for buyers of new motor vehicles.

13  4 Witkin, Summary 10th (2005) Sales, § 318.  Subsection (d)(2) provides a variety of consumer

14  protections for situations in which a "manufacturer or its representative . . . is unable to service or

15  repair a new motor vehicle . . . to conform to the applicable express warranties."  As defendants argue,

16  however, only a motorhome's chassis, as opposed to its coach, may be included in the definition of

17  a "new motor vehicle."  Nat'l R.V., 34 Cal. App. 4th at 1079.  Therefore, plaintiffs' § 1793.2(d)(2)

18  claim fails as a matter of law.

19           As to plaintiffs' claim under § 1793.2(d)(1), McMahon's argues it is not liable because it never

20  provided an express warranty to plaintiffs.  Plaintiffs have not disputed this assertion.  The Court

21  therefore grants McMahon's' motion as to this claim.  The Court now addresses Roadtrek's motion

22  for summary adjudication of plaintiffs' claim under § 1793.2(d)(1).

23           Roadtrek concedes that the Roadtrek Limited Warranty is an express warranty and that

24  plaintiffs presented the vehicle to McMahon's, an authorized Roadtrek representative, for repair.  The

25  Court must therefore decide whether a dispute of material fact exists as to (1) whether the vehicle had

26  a defect or nonconformity covered by the express warranty; and (2) whether Roadtrek's representative,

27  ─────────────

28      [8] An L.P.G. regulator is a propane gas regulator.  The owner's manual indicates that "[a]s fuel
is used, L.P. gas passes from the top of the tank through the regulator into the gas lines and eventually
to the appliances."  (Manual at G-1, Deakins Decl. Ex. A)

08cv0686

1   McMahon's, repaired the defect or nonconformity after a reasonable number of repair attempts.

2   Robertson, 144 Cal. App. 4th at 798-799.

3       The first question is whether any of plaintiffs' complaints constituted defects or

4   nonconformities covered by the warranty.  The side door, as part of the coach portion of the

5   motorhome, was warranted to be free from defects in material and workmanship for three years, until

6   May 14, 2007, by the Roadtrek Limited Warranty.  The parties argue at length over whether plaintiffs'

7   complaints about the side door are "defects" under the warranty.  In particular plaintiffs have

8   maintained that the side door is not flush with the remainder of the vehicle's body.  Mr. Hemphill

9   states that when he brought the vehicle home he noticed this problem and was told by McMahon's in

10  May 2004 that it could not be fixed.  (Hemphill Depo. pp. 138:17-139:19.)  A November 30, 2006

11  work order from McMahon's states: "[d]oor looks to be out of alignment[,] larger gap at the top of

12  door and as door goes down the space gets more narrow.  Recommend body shop to advise."

13  (Schilperoort Decl., Ex. G.) Plaintiffs submitted a December 2007 photograph of the vehicle depicting

14  the door remains out of alignment.  (NOL, Ex. 7).  Deakins testified ". . . that the door does not sit 100

15  percent with even gaps on either side, but it's not out of alignment to affect the operation of the door."

16  (Deakins Depo., pp. 66:14-16, NOL, Ex. 2.)  Roadtrek argues no defect exists covered by the warranty

17  because their expert Mr. Sprengen concludes the door "is installed and operates as designed." (Motion

18  at 12.)  However his report states:  "that the side door and latch operate properly," not that the door

19  was installed properly. (Spengen Report III(C), Spengen Decl., Ex. 3.)

20      The final question is whether Roadtrek failed to repair the defect or nonconformity after a

21  reasonable number of repair attempts.  Roadtrek argues that "although Plaintiffs requested on at least

22  three occasions that the side door be repaired, [McMahon's] either made repairs or could not locate

23  any repairable issues."  (Motion at 12.)  Roadtrek does not dispute that "at least three occasions"

24  constitutes a reasonable number of attempts.  However, Roadtrek has presented no evidence that it

25  attempted to fix the misaligned door, much less that it actually made repairs.  The record merely

26  indicates Roadtrek made repairs to the latch.  "[T]he only affirmative step the [Song Beverly Act]

27  imposes on consumers is to 'permit[] the manufacturer a reasonable *opportunity* to repair the vehicle.'

28  Whether or not the manufacturer's agents choose to take advantage of the opportunity, or are unable

despite that opportunity to isolate and make an effort to repair the problem, are matters for which the consumer is not responsible."  Oregel v. American Isuzu Motors, Inc., 90 Cal. App. 4th 1094, 1103-1104 (Cal. Ct. App. 2001).  At the very least, there is a dispute of material fact regarding this issue.

        D)        § 1794.4 and § 1794.41 Service Contracts in Addition to Or In Lieu of Express Warranties

Plaintiffs generally allege that Roadtrek and McMahon's violated Cal. Civ. Code §§ 1794.4 and 1794.41.  These sections govern requirements for "service contracts," which are written contracts "to perform for an additional cost, over a fixed period of time or for a specified duration, services relating to the maintenance, replacement, or repair of a consumer product."[9]  Plaintiffs present no evidence Roadtrek violated § 1794.4, or that either defendant violated § 1794.41.  Therefore, these claims fail as a matter of law.

Plaintiffs argue, however, that McMahon's violated § 1794.4(b) by breaching the terms of service contract.  The discussion below focuses on this claim.[10]

        1)        Legal Standard

Cal. Civ. Code § 1794.4(b) provides that "[e]xcept as otherwise provided in the service contract, every service contract shall obligate the service contractor to provide to the buyer of the product all of the services and functional parts that may be necessary to maintain proper operation of the entire product under normal operation and service for the duration of the service contract and without additional charge."  Cal. Civ. Code § 1794.4(b) (2009).

        2)        Terms of the Service Contract

The service contract provides, in relevant part:
**AUTHORIZATION IS REQUIRED PRIOR TO THE COMMENCEMENT OF ALL REPAIRS . . .PLEASE CALL NATIONWIDE CLAIMS 1-800-527-3426.**
...
What Is Covered: Upon payment of the deductible amount per repair visit selected on the front of this extended service agreement and before the expiration of this extended

---

[9]  Cal. Civ. Code § 1791(o) (2008).  Section 1791 provides the definitions of terms used in the Song-Beverly Act.

[10]  The complaint does not specify which subsection of § 1794.4 McMahon's allegedly violated.  As the parties' papers discuss only § 1794.4(b), the Court construes plaintiffs' allegations under § 1794.4 as limited to subsection (b).

service agreement, the Selling Dealer will make necessary repairs to the components below, **which are not covered by the manufacturer's warranty**.

...

L.P. Gas System–Regulators, L.P. tank, valves, gauges, mounting brackets, pigtails, L.P. lines, fittings, connections, and automatic shutoff.

...

Frame–L.P mounting bracket, bumper welds, bumper wheels, all chassis frame welds, manual lift-jacks, latch, lift crank, pulleys, and motor.

...

**What Is Not Covered:** Any items not listed under "What Is Covered." . . . **Repairs covered by any manufacturer's warranty** . . . .

...

What To Do If Repairs Are Needed: **If your Manufacturer's Warranty is still in effect, contact the Selling Dealer.** After the Expiration of your Manufacturer's Warranty and if your vehicle is within one hundred (100) miles of the Selling Dealer, you must deliver your vehicle to the Selling Dealer at the address shown on the front of this agreement . . . . To assure coverage under the terms of this extended service agreement, **authorization on behalf of the Selling Dealer** must be obtained prior to teardown or repair. Call the toll free claims number listed on the front. . . .

[Smith Decl. ISO McMahon's Motion, ("Smith Decl."), Doc. No. 47, Ex. A.] (emphasis added).

### 3)   Analysis

§ 1794.4(b) provides that a service contractor must comply with its terms "[e]xcept as otherwise provided in the service contract." Cal. Civ. Code § 1794.4(b) (2009). Thus, to the extent the service contract's terms differ with § 1794.4(b), the terms of the contract govern. As discussed below, the evidence is undisputed that plaintiffs never made a claim under the terms of the service contract and thus never invoked its protections.

As a prerequisite to assurance of coverage, the contract expressly requires any claim under the agreement to be authorized first by calling First Extended, the administrator of the service contract. (Smith Decl., Ex. A.) Mr. Hemphill states, "At one point when I experienced something wrong with the vehicle, I tried to contact the First Extended Service Corporation, the company I thought administered the service contract . . . .However, they told me to take the vehicle into McMahon's to find out whether a claim would be covered. I never tried to call First Extended again and simply took all repairs to the attention of McMahon's and Roadtrek." (Hemphill Decl., ¶ 8.) First Extended correctly referred Mr. Hemphill to McMahon's because the service contract required the consumer to contact the Selling Dealer directly for service under the manufacturer's warranty if the warranty is still in effect. Plaintiffs do not dispute that the Roadtrek Limited Warranty was still in effect when Mr. Hemphill called First Extended. Moreover, First Extended has no record in its database that

1   plaintiffs ever made a claim under the contract.  (Smith Decl., ¶4, Ex. B.) McMahon's has presented

2   evidence that First Extended's standard business practice is to record every service call made against

3   a service contract.  [Schilperoort Decl., ¶4; Gonzalez Decl. ISO McMahon's Motion, ("Gonzalez

4   Decl."), Doc. No. 49,  ¶6.]  Plaintiffs have not rebutted this evidence with any evidence to the

5   contrary.

6        Because the evidence is undisputed that plaintiffs never properly invoked the service contract,

7   their claim that McMahon's breached the service contract fails. It follows that plaintiffs' claim that

8   McMahon's violated § 1794.4(b) also fails because the statute defers to the terms of the contract.

9   **IV.**      **Breach of Express Warranty (Plaintiffs' Fourth Cause of Action)**

10       Plaintiffs' complaint alleges Roadtrek and McMahon's  breached an express warranty in

11   violation of Cal. Com. Code § 2313.  As an initial matter, McMahon's argues it cannot be held liable

12   under § 2313 because McMahon's did not provide an express warranty for the vehicle.  Plaintiffs have

13   not disputed this assertion.  Therefore, plaintiffs' claim fails as to defendant McMahon's.  The Court

14   addresses plaintiff's claim as to Roadtrek below.

15       A)      Legal Standard

16       Section 2313 provides that express warranties are created in the following ways: (1) "[a]ny

17   affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes

18   part of the basis of the bargain creates an express warranty that the goods shall conform to the

19   affirmation or promise;" (2) "[a]ny description of the goods which is made part of the basis of the

20   bargain creates an express warranty that the goods shall conform to the description;" and (3) "[a]ny

21   sample or model which is made part of the basis of the bargain creates an express warranty that the

22   whole of the goods shall conform to the sample or model."  Cal. Com. Code  § 2313 (2008).

23       In order to prevail on an express warranty claim, a plaintiff must prove that the seller or

24   manufacturer: (1) made an affirmation of fact or promise or provided a description of its goods; (2)

25   the promise or description formed part of the basis of the bargain; (3) the express warranty was

26   breached; and (4) the breach caused harm to the plaintiff.  Blennis v. Hewlett-Packard Co., 2008 U.S.

27   Dist. LEXIS 106464, *5-6 (N.D. Cal. 2008).  Harm is measured by loss directly and naturally resulting

28   from the breach of the warranty;  typically the difference between the value of the goods at the time

1  of delivery and the value they would have had if they had conformed to the warranty.  Daugherty v.

2  American Honda Motor Co., Inc., 144 Cal. App. 4th 824, 830 (Cal. Ct. App. 2006) (citing Cal. Com.

3  Code, §§ 2313(1)(a); 2714(2));  Rose v. Chrysler Motors Corp., 212 Cal. App. 2d 755, 763 (Cal. Ct.

4  App.1963).

5         B)     Analysis

6         Roadtrek concedes the Roadtrek Limited Warranty is an express warranty, and the warranty

7  was part of the bargain.  (Motion at 16.)  Therefore, the Court need only determine whether issues of

8  material fact exist with regard to breach of the express warranty and whether plaintiffs were harmed.

9  A dispute of material fact exists as to the vehicle's misaligned side door that precludes summary

10  judgment on this cause of action.

11         The Roadtrek Limited Warranty warranted the side door, as part of the coach portion of the

12  vehicle, to be free from defects in material and workmanship for three years from purchase.  See

13  Section III(C) *supra*.  As the Court also discussed *supra*,  there is a dispute of material fact as to

14  whether the misaligned door breached the Roadtrek Limited Warranty.  Plaintiffs suffered harm from

15  the breach if they did not receive the vehicle they bargained for; i.e. a vehicle free of defects in

16  workmanship.  See Rose, 212 Cal. App. 2d at 763.  However, defendant Roadtrek has shown that a

17  genuine issue of material fact exists as to whether the misaligned door conformed with the warranty.

18  Roadtrek's motion for summary adjudication on this claim is denied.

19  **V.**      **Breach of Implied Warranties (Plaintiffs' Fifth Cause of Action)**

20         Plaintiffs allege  Roadtrek and McMahon's breached implied warranties of merchantability

21  and of fitness for a particular purpose, in violation of Cal. Com. Code §§ 2314[11] and 2315.[12]

22  ///

23

---

24      [11]  Section 2314 provides, "a warranty that the goods shall be merchantable is implied in a
contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Comm. Code

25  § 2314(1) (2008).  In relevant part, the statute provides that "merchantable" goods are as follows: (a)
Pass without objection in the trade under the contract description; and . . .(c) Are fit for the ordinary

26  purposes for which such goods are used[.]  Id., § 2314(2).

27      [12]  "Where the seller at the time of contracting has reason to know any particular purpose for
which the goods are required and that the buyer is relying on the seller's skill or judgment to select or

28  furnish suitable goods, there is unless excluded or modified under the next section an implied warranty
that the goods shall be fit for such purpose."  Cal. Comm. Code § 2315 (2008).

08cv0686

A)    Applicability of §§ 2314 and 2315 to Roadtrek

Roadtrek argues it cannot be held liable under §§ 2314 and 2315 because plaintiffs and Roadtrek do not stand in vertical privity[13] with one another.  Privity of contract is a prerequisite in California for recovery on a theory of breach of implied warranties of merchantability and fitness.  All West Electronics, Inc. v. M-B-W, Inc., 64 Cal. App. 4th 717, 725 (Cal. Ct. App. 1998).  "[T]he distributor is normally in vertical privity with the manufacturer, and the ultimate retail buyer is normally in vertical privity with the dealer. But if the retail buyer seeks warranty recovery against a manufacturer with whom he has no direct contractual nexus, the manufacturer would seek insulation via the vertical privity defense."  Osborne v. Subaru of Am., 198 Cal. App. 3d 646, 656 n. 6 (Cal. Ct. App. 1988) (citation omitted).

Plaintiffs argue they stand in vertical privity with Roadtrek because such privity does not have to be predicated on a written contract.  They argue there were sufficient direct dealings with Roadtrek to constitute vertical privity, or at least to create a dispute of material fact as to whether vertical privity exists.  Plaintiffs' factual basis for this argument is that they made  complaints about the vehicle's continuing defects directly to Roadtrek after the "defects in the . . .vehicle were not repaired."  (Opp. at 20.)

Plaintiffs rely on U.S. Roofing, Inc. v. Credit Alliance Corp., 228 Cal. App. 3d 1431, 1442 (Cal. Ct. App. 1991) in support of their argument.  In U.S. Roofing, the plaintiff negotiated the purchase of a crane from a supplier, Liquid Asphalt Systems ("LAS") and paid LAS two deposits.  LAS suggested a leasing arrangement whereby a third party, Leasing Service Corporation ("LSC") paid the remainder of the purchase price for the crane and then leased the crane to the plaintiff.  Under the arrangement LAS and LSC entered into a sales agreement, but LAS and the plaintiff did not.  The crane malfunctioned, and the plaintiff sued LAS, among others, for breach of implied warranty.  Although no written sales contract existed between the plaintiff and LAS, the court determined LAS could have been in privity of contract with the plaintiff based on the evidence of direct dealings between the plaintiff and LAS regarding the sale.  Id.

---

[13] "The term 'vertical privity' refers to links in the chain of distribution of goods. If the buyer and seller occupy adjoining links in the chain, they are in vertical privity with each other."  Osborne v. Subaru of Am., 198 Cal. App. 3d 646, 656 (Cal. Ct. App. 1988).

08cv0686

1    Plaintiffs are correct that vertical privity need not be premised on a written contract.  Id.

2  However, vertical privity must be premised on some type of *sales contract*, written or otherwise.  See

3  All West Electronics, 64 Cal. App. 4th at 725 (Cal. Ct. App. 1998) (holding that a finding of breach

4  of implied warranty required a written or oral sales agreement between the manufacturer and the

5  plaintiff).  Accordingly, U.S. Roofing is distinguishable from the present case because the court

6  determined there a factual question as to whether the *seller* was LAS or LSC.  Here, the sales contract

7  clearly indicates McMahon's as the seller of the vehicle. (Schilperoort Decl., Ex. J.) Plaintiffs' claims

8  against Roadtrek under §§ 2314 and 2315 fail as a matter of law.

9    B)    Applicability of §§ 2314 and 2315 to McMahon's

10    McMahon's also moves for summary judgment on plaintiffs' causes of action for breach of

11  implied warranties of merchantability and fitness under Cal. Comm. Code §§ 2314 and 2315.

12    The legal standards for breach of implied warranties of merchantability and fitness under the

13  California Commercial Code and the Song Beverly Act are identical.  See Am. Suzuki, 37 Cal. App.

14  4th at 1295 n. 2 ("The Song-Beverly Act incorporates the provisions of sections 2314 and 2315. It

15  'supplements, rather than supersedes, the provisions of the California Uniform Commercial Code' by

16  broadening a consumer's remedies to include costs, attorney's fees, and civil penalties.") Accordingly,

17  the Court denies McMahon's motion for summary judgment on plaintiffs' Cal. Comm. Code § 2314

18  and grants McMahon's motion for summary judgment on plaintiffs' Cal. Comm. Code § 2315 claim

19  for the same reasons articulated in Sections III (A)(2) and (B)(2) *supra*.

20  **VI.    Magnuson-Moss Act (Plaintiffs' First Cause of Action)**

21    Plaintiffs allege Roadtrek violated the Magnuson-Moss Act, 15 U.S.C. § 2301 et seq., by

22  failing to comply with their obligations under "the written and implied warranties and service

23  contract."  (Compl. ¶ 18.)    Plaintiffs' complaint does not articulate which provisions of the

24  Magnuson-Moss Act Roadtrek violated.  As the parties' papers discuss only §§ 2302, 2303, 2304 and

25  2310(d), the Court construes plaintiffs' allegations as limited to those sections.

26    A)    Applicability of §§ 2302, 2303, and 2304

27    Roadtrek argues it has complied with the requirements of §§ 2302 (setting out disclosure

28  requirements for warranties) and 2303 (requiring that a warranty be clearly and conspicuously

1    designated as either a "full warranty" or "limited warranty").  Plaintiffs have not disputed this

2    assertion.  Therefore plaintiffs' claims fail.

3        Roadtrek additionally argues that it is not subject to § 2304 (establishing minimum standards

4    for full warranties) because the Roadtrek Limited Warranty is a conspicuously designated "limited

5    warranty" as opposed to a "full warranty."  15 U.S.C. § 2304 applies only to full warranties.  Milicevic

6    v. Fletcher Jones Imps., Ltd., 402 F.3d 912, 919 n. 4 (9th Cir. 2005).  Section 2303(a)(2) provides "If

7    the written warranty does not meet the Federal minimum standards for warranty set forth in section

8    2304 of this title, then it shall be conspicuously designated a "limited warranty."  The Roadtrek

9    document clearly states "Limited Warranty Information" in the heading, and the warranty itself is

10   entitled "Roadtrek Limited Warranty."  (Roadtrek Owner's Manual at I-3, Deakins Decl., Ex. A.)

11   Accordingly, the Court grants Roadtrek's motion for summary judgment on plaintiffs' § 2304 claim.

12       B)    § 2310 Remedies in Consumer Disputes

13       The Magnuson-Moss Act provides that "a consumer who is damaged by the failure of a

14   supplier, warrantor, or service contractor to comply with any obligation under this title, or under a

15   written warranty, implied warranty, or service contract, may bring suit for damages and other legal

16   and equitable relief."  15 U.S.C. § 2310(d)(1) (2009).

17       Roadtrek argues it cannot be held liable because it fulfilled its obligations to plaintiffs pursuant

18   to the provisions of the Limited Warranty by making appropriate warranty repairs when required, and

19   it complied with State laws pertaining to express and implied warranties.  Plaintiffs disagree, and state

20   they have been damaged by Roadtrek's failures to comply with any express or implied warranties.

21       Although the Magnuson-Moss Act creates a separate federal cause of action for breach of an

22   implied warranty, courts must look to the relevant state law to determine the meaning and creation of

23   any implied warranty.  See 15 U.S.C. § 2301(7) ("The term 'implied warranty' means an implied

24   warranty arising under State law . . . in connection with the sale by supplier of a consumer product.")

25   Accord Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1022 n. 4 (9th Cir. 2008) (holding that the

26   plaintiff's federal claims of breach of express and implied warranties hinged on the success of his state

27   law warranty claims).  Breach of an express limited warranty also provides a federal cause of action

28   under 15 U.S.C. § 2310(d)(1).  See Milicevic, 402 F.3d at 919 n. 4.  The contours of this federal

1 protection similarly depend on state substantive law.  <u>Clemens</u>, 534 F.3d 1017 at 1022; <u>see also</u> <u>Gusse</u>

2 <u>v. Damon Corp.</u>, 470 F. Supp. 2d 1110, 1116-17 (C.D. Cal. 2007).

3       Here, plaintiffs have met their burden of showing that a dispute of material fact exists with

4 regard to their breach of express warranty and implied warranty of merchantability claims under state

5 law.  <u>See</u> Sections III (A),(C) and IV *supra*.  Accordingly, the Court denies Roadtrek's motion for

6 summary judgment on plaintiff's claim under § 2310(d)(1)**.**

7 **<u>VII.    Consumers Legal Remedies Act (Plaintiffs' Second Cause of Action)</u>**

8       California's Consumers Legal Remedies Act ("CLRA") makes unlawful various "unfair

9 methods of competition and unfair or deceptive acts or practices undertaken by any person in a

10 transaction intended to result or which results in the sale or lease of goods or services to any

11 consumer." Cal. Civ. Code § 1770(a) (2009).  Of these proscribed practices, plaintiffs allege Roadtrek

12 and McMahon's "[r]epresented that goods or services have sponsorship, approval, characteristics,

13 ingredients, uses, benefits, or quantities which they do not have" (<u>Id.</u>, subd.(a)(5)) and "[r]epresented

14 that goods or services are of a particular standard, quality, or grade, or that goods are of a particular

15 style or model, if they are of another." (<u>Id.</u>, subd. (a)(7)).  An individual action may be brought under

16 the CLRA pursuant to § 1780(a), which provides that "[any] consumer who suffers any damage as a

17 result of the use or employment by any person of a method, act, or practice declared to be unlawful

18 by Section 1770 may bring an action against such person . . . ." Cal. Civ. Code § 1780(a) (2009).

19       Plaintiffs set forth several arguments regarding defendants' alleged CLRA violations.  First,

20 plaintiffs state Roadtrek's advertising brochure and video contained numerous representations about

21 the quality of the vehicle that plaintiffs discovered to be untrue. (Opp. at 22.)  Although plaintiffs have

22 presented evidence showing they relied heavily on this brochure and video in making their decision

23 to purchase the vehicle (Hemphill Decl., ¶ 3,) they have not specified which representations in the

24 brochure and video were false or inaccurate.  Only factual representations regarding goods or services

25 are actionable under the CLRA.  <u>See</u> <u>Consumer Advocates v. Echostar Satellite Corp.</u>, 113 Cal. App.

26 4th 1351, 1361-62 (Cal. Ct. App. 2003).  "Mere puffing" about a product, which is common in

27 advertising materials, is not  actionable.  <u>Id.</u> n. 3.  Because plaintiffs have not identified which

28

1    statements in the advertising materials allegedly violated the CLRA, it is unclear whether the

2    representations to which they refer are factual representations or mere puffery.

3        Second, plaintiffs state the brochure's description of the warranty is "open to interpretation

4    regarding what the [warranty's]'limitations' would be because the brochure [only] describes the

5    'motorhome' warranty." (Opp. at 22.) Plaintiffs cite to the following text in the brochure to support

6    their argument:

7           MOTORHOME: 3 year/36,000 mile/60,000 km limited warranty
             offered by Home & Park covering the manufacture of the motorhome
8             only (does not include the chassis).

9    (NOL, Ex.4, PTLF 0123.) This representation does not constitute a CLRA violation because it is true.

10   Accord Consumer Advocates, 112 Cal. App. 4th at 1361 (holding a true statement did not violate the

11   CLRA). To the extent plaintiffs argue the representation is misleading, they do not cite to any

12   evidence showing they were misled.

13       Third, plaintiffs argue "[d]efendants represented that the repairs being performed on the

14   vehicle would be lasting repairs that thoroughly addresses the defects being complained of." (Opp.

15   at 22.) However, the repairs took place *after* the sale of the vehicle, and thus could not have

16   constituted "deceptive acts . . .intended to result. . . in the sale or lease of goods or services" under Cal.

17   Civ. Code § 1770(a). Thus, plaintiffs' claims against Roadtrek and McMahon's under the CLRA fail.

18   **VIII.   Breach of Contract (Plaintiffs' Sixth Cause of Action)**

19       In order to prevail on a claim for breach of contract, a plaintiff must prove: the existence of

20   a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach, and (4)

21   damages to plaintiff therefrom. Acoustics, Inc. v. Trepte Construction Co., 14 Cal. App. 3d 887, 913

22   (Cal. Ct. App. 1971).

23       Plaintiff alleges breach of contract against McMahon's only. The parties do not dispute that

24   they entered into two contracts relevant to the instant lawsuit: the Retail Installment Sale Contract

25   ("RISC") and the service contract. The RISC governed the financing terms for the vehicle's purchase.

26   Plaintiffs do not present any evidence that McMahon's breached any of the financing terms. With

27   respect to the service contract, it is undisputed that plaintiffs never properly invoked the coverage

28

1  under that contract.  <u>See</u> Section III(D) *supra*.  The Court grants McMahon's motion for summary

2  judgment on this claim.

3  **IX.    Breach of Covenant of Good Faith and Fair Dealing (Plaintiffs' Seventh Cause of Action)**

4          "There is implied in every contract a covenant by each party not to do anything which will

5  deprive the other parties thereto of the benefits of the contract.  This covenant not only imposes upon

6  each contracting party the duty to refrain from doing anything which would render performance of the

7  contract impossible by any act of his own, but also the duty to do everything that the contract

8  presupposes that he will do to accomplish its purpose."  <u>Harm v. Frasher</u>, 181 Cal. App. 2d 405, 417

9  (Cal. Ct. App. 1960).  The covenant's scope is limited to the purposes and express terms of the

10  contract.  <u>Carma Developers, Inc. v. Marathon Development California, Inc.</u>, 2 Cal. 4th 342, 373 (Cal.

11  1992).  The covenant can be breached by objectively unreasonable conduct, regardless of the actor's

12  motive.  <u>Id.</u>

13          Plaintiffs' complaint alleges McMahon's breached the implied covenant of good faith and fair

14  dealing ("implied covenant") with respect to the RISC and the service contract.  For the reasons

15  discussed in Section VIII above, the Court grants McMahon's motion for summary judgment on this

16  claim.

17  **X.    Strict Liability and Negligence (Plaintiffs' Eighth and Ninth Causes of Action)**

18          Plaintiffs allege Roadtrek and McMahon's are "strictly liable and responsible to Plaintiffs" as

19  a result of the alleged defects in the vehicle.  (Compl., ¶ 73.)  Plaintiffs allege the defective conditions

20  and inadequate repairs resulted "in a damaged and defective vehicle and in personal injury, emotional

21  distress, and other damages to the Plaintiffs."  (Compl., ¶ 74.)  Plaintiffs also allege negligence against

22  Roadtrek and McMahon's with regard to the design, manufacture, inspection, sale and repair of the

23  subject vehicle.

24          A plaintiff may only recover for products liability torts for "physical harm to person or

25  property."  <u>Jimenez v. Superior Court</u>, 29 Cal. 4th 473, 482 (Cal. 2002) (articulating the standard for

26  recovery under a strict products liability theory); <u>Seely v. White Motor Co.</u>, 63 Cal. 2d 9, 18 (Cal.

27  1965) ("Even in actions for negligence, a manufacturer's liability is limited to damages for physical

28  injuries and there is no recovery for economic loss alone.")  This principle is known as the "economic

1    loss rule." Jimenez, 29 Cal. 4th at 482.  Physical harm to property may include damage that a

2    defective product causes to other portions of a larger product.  Id.  However, "when the defect and the

3    damage are one and the same, the defect may not be considered to have caused physical injury."

4    Sacramento Reg'l Transit Dist., 158 Cal. App. 3d at 293.  "Distinguishing between 'other property'

5    and the defective product itself in a case involving component-to-component damage requires a

6    determination whether the defective part is a sufficiently discrete element of the larger product that

7    it is not reasonable to expect its failure to invariably damage  other portions of the finished product."

8    KB Home v. Superior Court, 112 Cal. App. 4th 1076, 1087 (Cal. Ct. App. 2003).

9        Here, defendants have presented evidence that plaintiffs suffered no bodily harm as a result

10   of the vehicle's defects by attaching plaintiffs' discovery responses stating they incurred no physical

11   injury.  (Obeid Decl. ¶ 7, Ex. E, Responses to Interrogatories 11, 12, and 13; Id. ¶ 9, Ex. G, Responses

12   to Interrogatories 1-6; Id. ¶ 13, Ex. K, Response to Request for Admissions 14.)  Plaintiffs have not

13   rebutted this evidence.  Therefore, the tort claims may not proceed on the basis of personal injury.

14       Plaintiffs have also not presented evidence showing property damage beyond the damage

15   sustained by the vehicle itself.[14]  The sole evidence of property damage in the record consists of: (1)

16   stains on the vehicle's curtains from a leak from the air conditioner (Schilperoort Decl., Ex. D); and

17   (2) stains on a removable kitchen carpet due to refrigerator to leak caused by the malfunctioning

18   generator.  (Deakins Decl. Ex. C at RMI 93 and 98.)  For products liability purposes, the determination

19   of whether "property damage" is sustained by the product itself or "other property" is generally the

20   province of the trier of fact.  KB Home, 112 Cal. App. 4th at 1079.  However, summary judgment is

21   proper "if the uncontradicted facts established through discovery are susceptible of only one legitimate

22   inference."  Id. at 1080 n. 2 (citation omitted.)

23       The KB Home court set out four factors as relevant to identifying "the product" and

24   determining whether "other property" or only the defective product itself has been damaged.  Under

25   those factors, the undisputed facts indicate (1) the allegedly defective components (the generator and

26   air conditioner) perform an integral function in the operation of the larger product (the vehicle's

27

28       [14] In fact, plaintiffs' discussions of their tort claims in their opposition briefs do not cite to *any*
     example of property damage in the record.

coach); (2) the generator and air conditioner do not have any independent use to plaintiffs other than as incorporated into the coach; (3) The stains on the carpet on curtains were closely related to the inherent nature of the alleged defects of the air conditioner and generator; and (4) the air conditioner and generator were placed into the stream of commerce as part of the larger product, the motorhome coach.  The generator and air conditioner were therefore  not sufficiently discrete elements of the coach that it would be unreasonable to expect their failure to damage other portions of the coach.  KB Home, 112 Cal. App. 4th at 1087.[15]  Roadtrek's and McMahon's motions for summary judgment on plaintiffs' strict liability and negligence claims are therefore granted.

**XI.**     **Fraud (Plaintiffs' Tenth Cause of Action)**

   A)     Legal Standard

In order for a plaintiff to prevail on a fraud claim, he must show: (a) misrepresentation of fact (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.  Engalla v. Permanente Medical Group, Inc., 15 Cal. 4th 951, 974 (Cal. 1997) (citation omitted).

   B)     Roadrek's and McMahon's Motions

Defendants argue plaintiffs have not shown: (a) defendants misrepresented the construction, inspection, or condition of the vehicle, (b) defendants possessed the requisite knowledge of falsity, (c) defendants intended to defraud plaintiffs, and (d) plaintiffs suffered money damages as a result of the alleged fraud.

Plaintiffs respond they have presented evidence establishing fraud with regard to the condition of the vehicle as well as the scope of the repairs based on two  alleged misrepresentations, which are set forth below.

> 1) Defendants repeatedly represented to plaintiffs that the vehicle was brand new, with the implication that the vehicle would operate as a new vehicle.  (Opp. at 25.)

This basis for fraud fails because plaintiffs have not offered any evidence to dispute that the vehicle was not new at the time of purchase.  Defendants, on the other hand, have submitted certificates of origin for the vehicle's coach and chassis dated just before plaintiffs purchased the

---

[15]  Moreover, Roadtrek did not manufacture the generator or the air conditioner.

vehicle (April 30, 2004 and April 23, 2004, respectively), classifying the vehicle as new. (Schilperoort Decl., Ex. I.)

> 2) Defendants continually misrepresented to plaintiffs that the vehicle was "either repaired or could not be repaired when further repairs, to the side door, for example, could be made." (Opp. at 25.)

Plaintiffs offer Mr. Hemphill's declaration in support of the alleged misrepresentation. The declaration in essence describes how each time plaintiffs attempted to use the vehicle, a litany of things went wrong, even after McMahon's claimed to have repaired the vehicle's problems. (Hemphill Decl., ¶¶ 4-22.) Defendants do not dispute the vehicle still needed repairs after their repair attempts. They merely dispute that they misrepresented facts because motor homes are complicated, and often in need of repair.

With regard to the "knowledge of falsity" element, plaintiffs argue defendants knew the vehicle, at the time of sale and during the repair attempts, did not operate as it should. Nevertheless, defendants continually told plaintiffs they had completed the repairs. (Opp. at 25.) In support, plaintiffs cite generally to a paragraph in Deakins' declaration (Deakins Decl., ¶8,) and to pages of the Roadtrek marketing brochure touting the benefits of the vehicle. The cited paragraph details Roadtrek's recordkeeping procedures for warranty repairs and describes four different times plaintiffs called in with complaints. This evidence does not establish defendants knew during the time of sale and after each repair attempt the vehicle was not actually functional. Moreover, even if this evidence creates a dispute of material fact as to knowledge of falsity, plaintiffs present no evidence that defendants intended to induce plaintiffs to rely on the alleged misrepresentations. Accordingly, the Court grants Roadtrek and McMahon's motion for summary judgment on the fraud claim.

## CONCLUSION

For the foregoing reasons, the Court:

1)   GRANTS Roadtrek's motions for summary judgment on: (a) the following claims under the Song-Beverly Act: Cal. Civ. Code §§ 1792.1, 1793.1, 1793.2(d)(2), 1793.22, 1793.23, 1793.24, 1794.4, 1794.41, and 1795.5; (b) Breach of Implied Warranty of Merchantability: Cal. Comm. Code § 2314; (c) Breach of Implied Warranty of Fitness for a Particular Purpose: Cal. Comm. Code § 2315; (d) the following claims under the

1  Magnuson-Moss Act: 15 U.S.C. §§ 2202, 2203, and 2204; (e) the CLRA claim: Cal.

2  Civ. Code § 1770; (f) Strict Liability; (g) Negligence; and (h) Fraud.

3  2)   GRANTS McMahon's motions for summary judgment on: (a) the following claims

4      under the Song-Beverly Act: Cal. Civ. Code §§ 1792.1, 1793.1, 1793.2, 1793.22,

5      1793.23, 1793.24, 1794.4, 1794.41, and 1795.5; (b) Breach of Express Warranty: Cal.

6      Comm. Code § 2313; (c) Breach of Implied Warranty of Fitness for a Particular

7      Purpose: Cal. Comm. Code § 2315; (d) the CLRA claim: Cal. Civ. Code § 1770; (e)

8      Breach of Contract; (f) Breach of Implied Covenant of Good Faith and Fair Dealing;

9      (g) Strict Liability; (h) Negligence; and (i) Fraud.

10 3)   DENIES Roadtrek's motions for summary judgment on: (a) the following claims under

11     the Song-Beverly Act: Cal. Civ. Code §§ 1792 and 1793.2(d)(1); (b) the claim for

12     Breach of Express Warranty: Cal. Comm. Code § 2313; and (c) the following claim

13     under the Magnuson-Moss Act: 15 U.S.C. § 2310(d)(1).

14 4)   DENIES McMahon's motions for summary judgment on: (a) the following claim

15     under the Song-Beverly Act: Cal. Civ. Code § 1792; and (b) the claim for Breach of

16     Implied Warranty of Merchantability: Cal. Comm. Code § 2314.

17 5)   OVERRULES plaintiffs' evidentiary objections.

19 **IT IS SO ORDERED.**

20 **DATED:  April 2, 2009**

22 **IRMA E. GONZALEZ, Chief Judge**
   **United States District Court**

- 30 -

08cv0686